IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:25-cv-76

| | | |
|---|---|---|
| VAPOR TECHNOLOGY ASSOCIATION;<br>AMV HOLDINGS, LLC d/b/a KURE<br>CBD AND VAPE; WAGES AND WHITE<br>LION INVESTMENTS, LLC d/b/a TRITON<br>DISTRIBUTION; BRIGHT LEAF VENDORS,<br>INC.; and REAGAN MURPHY, | )<br>)<br>)<br>)<br>)<br>) | |
| | ) | __COMPLAINT__ |
| | ) | (Preliminary Injunction Requested) |
| Plaintiffs, | )<br>) | |
| | ) | |
| v. | )<br>) | |
| | ) | |
| MCKINLEY WOOTEN, JR., NORTH<br>CAROLINA SECRETARY OF REVENUE;<br>PHILIP E. BERGER, PRESIDENT PRO<br>TEMPORE OF THE NORTH CAROLINA<br>SENATE; and DESTIN HALL, SPEAKER<br>OF THE NORTH CAROLINA HOUSE OF<br>REPRESENTATIVES, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Vapor Technology Association ("VTA"), AMV Holdings, LLC d/b/a Kure CBD

and Vape ("AMV"), Wages and White Lion Investments, LLC d/b/a Triton Distribution

("Triton"), Bright Leaf Investments, LLC ("Bright Leaf"), and Reagan Murphy bring this

Complaint for declaratory and injunctive relief against McKinley Wooten, Jr., in his official

capacity as the North Carolina Secretary of Revenue, Philip E. Berger, in his official capacity as

President Pro Tempore of the North Carolina Senate, and Destin Hall, in his official capacity as

Speaker of the North Carolina House of Representatives. In support of their Complaint, Plaintiffs

state as follows:

## INTRODUCTION

1. Plaintiffs bring this Complaint to preliminarily and permanently enjoin Defendants from implementing and enforcing Session Law 2024-31 (hereinafter "S.L. 2024-31"), codified at North Carolina General Statutes §§ 14-313 and 143B-245.10 to 143B-245.16. A copy of S.L. 2024-31 is attached hereto as Exhibit A for reference.

2. The North Carolina General Assembly passed S.L. 2024-31 in June 2024, and the Governor signed S.L. 2024-31 into law in July 2024.

3. S.L. 2024-31 directs the Department of Revenue to take enforcement actions (including the issuance of fines and civil penalties) against the manufacturers and sellers of electronic nicotine delivery systems (also known as "ENDS," "e-cigarettes," and "vapor products") that have not received marketing authorization from the United States Food and Drug Administration ("FDA").

4. S.L. 2024-31 contains an exception for ENDS that were on the market as of August 8, 2016—the date ENDS containing tobacco-derived nicotine became subject to the Federal Food, Drug, and Cosmetic Act ("FDCA")—and that had a premarket tobacco product application ("PMTA") filed with the FDA by September 9, 2020, that is still undergoing FDA review or is the subject of ongoing litigation.

5. S.L. 2024-31 contains no such exception for ENDS containing non-tobacco-derived nicotine for which PMTAs were timely filed when ENDS containing non-tobacco-derived nicotine became subject to the FDCA in 2022.

6. Most ENDS on the market today do not yet have FDA authorization. Because the FDA recognizes that ENDS are less harmful than traditional cigarettes and that ENDS have helped many adult smokers quit smoking, the FDA exercises its discretion to enforce the FDCA's

2

Case 4:25-cv-00076-M-RJ    Document 1    Filed 04/30/25    Page 2 of 28

premarket authorization requirement for ENDS on a "case-by-case" basis. In other words, based on its enforcement discretion, the FDA chooses not to take regulatory or enforcement action regarding some unauthorized ENDS on the market.

7.      As a result of S.L. 2024-31, starting on June 29, 2025, Plaintiff VTA's manufacturer, distributor, and retailer members will be unable to sell many of their products in North Carolina, Plaintiffs AMV's and Bright Leaf's retail stores will be unable to sell most of the products that they currently sell in North Carolina, Plaintiff Triton Distribution will be unable to sell the non-tobacco-derived nicotine e-liquids that it manufactures to North Carolina distributors and retailers, and Plaintiff Murphy will be unable to purchase the ENDS products on which she relies to keep from reverting to traditional cigarettes.

8.      S.L. 2024-31 violates the Supremacy Clause of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment.

9.      The Supremacy Clause allows Congress to preempt state law. And preemption occurs when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. S.L. 2024-31 is preempted here because the legislation frustrates Congress's intent to give the Federal Government the exclusive authority to enforce the FDCA.

10.      Moreover, the Equal Protection Clause of the Fourteenth Amendment prohibits a state from treating similarly situated persons differently when that differential treatment lacks a rational basis. S.L. 2024-31 violates the Equal Protection Clause because it treats manufacturers, sellers, and consumers of certain ENDS with tobacco-derived nicotine differently from manufacturers, sellers, and consumers of ENDS containing non-tobacco-derived nicotine, even though there is no rational basis for such differential treatment.

3

11.     Because the Department of Revenue's planned enforcement of S.L. 2024-31 would require sellers of vapor products in North Carolina, including Plaintiffs AMV and Bright Leaf, to run the risk of incurring substantial fines or civil penalties for sales of ENDS products not eligible for sale under the statute or to shut down because they cannot maintain a profitable business with the limited range of ENDS products eligible for sale under the statute, and because S.L. 2024-31 would deprive consumers, including Plaintiff Murphy, of the ability to purchase and consume their preferred ENDS products because those products will not be eligible for sale, Plaintiffs seek preliminary and permanent injunctions against enforcement of S.L. 2024-31.

## PARTIES

12.     Plaintiff Vapor Technology Association is a vapor product industry trade association organized as a 501(c)(6) non-profit under the laws of the District of Columbia with its principal place of business at 418 C Street, NE, Washington, D.C. 20002. The VTA's members are dedicated to innovating and selling high-quality vapor products that provide adult smokers with a better alternative to combustible cigarettes. The VTA's members include businesses in every sector of the vapor product industry, such as manufacturers, distributors, wholesalers, suppliers, and retailers, as well individual consumers of vapor products. The VTA's members include manufacturers and sellers of ENDS products containing non-tobacco-derived nicotine that are the subject of timely filed PMTAs pending before the FDA that are still undergoing FDA review. The VTA educates lawmakers, other government officials, and the public on the facts about ENDS products and the impact that legislative and regulatory proposals would have on public health both at the federal level and at the state level, including in North Carolina.

13.     Plaintiff AMV Holdings, LLC d/b/a Kure CBD and Vape is a North Carolina limited-liability company headquartered in Mooresville, North Carolina that owns and operates

retail "vape shops" at various locations in and outside of North Carolina, including two shops located in Jacksonville, North Carolina, and six shops located in and around Wilmington, North Carolina. AMV, and its shops in Jacksonville and Wilmington, sell ENDS products containing non-tobacco-derived nicotine that are the subject of PMTAs pending before the FDA that are still undergoing FDA review. AMV is a member of the VTA. Below is an image of a typical Kure CBD and Vape retail store owned and operated by AMV:



14.     Plaintiff Bright Leaf Vendors, Inc. is a North Carolina corporation that is a franchisee of Plaintiff AMV and which owns and operates several retail vape shops, including a shop located at 1913 East Fire Tower Road, Suite B, Greenville, North Carolina 27858. Bright Leaf, and its shop in Greenville, sell ENDS products containing non-tobacco-derived nicotine that are the subject of PMTAs pending before the FDA that are still undergoing FDA review.

15.     Plaintiff Wages and White Lion Investments, LLC d/b/a Triton Distribution ("Triton") is a limited liability company organized under the laws of the State of Texas with its principal place of business in Richardson, Texas. Triton is a manufacturer of bottled e-liquids that contain non-tobacco-derived nicotine that are used in certain refillable ENDS devices. Triton's PMTAs for those e-liquids were timely filed with the FDA when ENDS containing non-tobacco-derived nicotine became subject to the FDCA in 2022; those PMTAs remain under FDA review. Triton sells those e-liquids to distributors and retailers in North Carolina, including AMV and other members of VTA. Triton is also a member of the VTA.

16.     Plaintiff Reagan Murphy is an individual citizen and resident of Davidson, North Carolina. Plaintiff Murphy started smoking traditional cigarettes at the age of 15 and was a pack-a-day smoker of traditional cigarettes for the better part of 24 years before she began using ENDS products. When she first tried ENDS products, she was able to immediately stop using traditional cigarettes as a result. Plaintiff Murphy relies on her continued ability to purchase and use certain ENDS products that do not yet have FDA marketing authorization, including unauthorized ENDS products containing non-tobacco-derived nicotine, to avoid regressing into use of traditional cigarettes. Enforcement of S.L. 2024-31 would deprive Plaintiff Murphy of the ability to purchase and use these ENDS products on which she relies.

17.     Defendant McKinley Wooten, Jr., who is sued in his official capacity, is the North Carolina Secretary of Revenue, and is responsible for the operations of the North Carolina Department of Revenue, the state agency tasked with enforcement of S.L. 2024-31. His office is in Raleigh, North Carolina.

18.     Defendant Philip E. Berger, who is sued in his official capacity, is the President Pro Tempore of the North Carolina Senate. His office is in Raleigh, North Carolina.

19.    Defendant Destin Hall, who is sued in his official capacity, is the Speaker of the North Carolina House of Representatives. His office is in Raleigh, North Carolina.

20.    Defendants Berger and Hall are properly joined as defendants in this action pursuant to North Carolina General Statutes §§ 1-72.2 and 120-32.6.

## JURISDICTION AND VENUE

21.    This action arises under and asserts claims based on violations of the United States Constitution and 42 U.S.C. § 1983. The Court therefore has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

22.    The Declaratory Judgment Act authorizes the Court to grant Plaintiffs' request for declaratory relief. 28 U.S.C. §§ 2201–2202.

23.    Because this action seeks to enjoin a state official from implementing and enforcing a state statute that violates the United States Constitution, the Eleventh Amendment to the United States Constitution does not prohibit this Court from deciding this action. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

24.    This Court has personal jurisdiction over the Department of Revenue because it is an Executive Branch agency of the State of North Carolina and is headquartered in Raleigh, North Carolina.

25.    This Court has personal jurisdiction over McKinley Wooten, Jr. in his official capacity as the Secretary of Revenue because his office is in Raleigh, North Carolina.

26.    This Court has personal jurisdiction over Philip E. Berger in his official capacity as President Pro Tempore of the North Carolina Senate because his office is in Raleigh, North Carolina.

27.     This Court has personal jurisdiction over Dustin Hall in his official capacity as Speaker of the North Carolina House of Representatives because his office is in Raleigh, North Carolina.

28.     Venue is proper in this district because this is a judicial district in which a Defendant resides and all Defendants are residents of the State in which this district is located. 28 U.S.C. § 1391(b)(1). Venue is also proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district. 28 U.S.C. § 1391(b)(2).

## LEGAL AND FACTUAL BACKGROUND

**A.      The Supremacy Clause of the United States Constitution provides that federal law preempts conflicting state law.**

29.     "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const., Art. VI, cl. 2).

30.     Federal law preempts state law "in three circumstances." *English v. General Electric Co.*, 496 U.S. 72, 78 (1990).

31.     "First, Congress can define explicitly the extent to which its enactments pre-empt state law." *Id.* This is referred to as "express preemption." *See, e.g.*, *Jaldin v. Recontrust Co., N.A.*, 539 F. App'x 97, 100 (4th Cir. 2013). "Second, in the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English*, 496 U.S. at 79. This is referred to as "field preemption." *Id.*

32.     Third, and relevant to this action, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby*, 530 U.S. at 372. This "implied conflict preemption" occurs where, *inter alia*, "state law 'stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"

*Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

**B.     The Fourteenth Amendment to the United States Constitution prohibits a State from denying persons the equal protection of the laws.**

33.     The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

34.     A State violates the Equal Protection Clause when it treats similarly situated persons differently and there is no rational basis for the differential treatment. *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

**C.     The Federal Food, Drug, and Cosmetic Act of 1938 gives the Federal Government the exclusive authority to enforce the Act.**

35.     In 1938, Congress enacted the Federal Food, Drug, and Cosmetic Act (the "FDCA" or "Act"). *See* Pub. L. No. 75-717, 52 Stat. 1040 (1938).

36.     Section 301(a) of the 1938 Act prohibited the interstate distribution of "adulterated" or "misbranded" foods, drugs, medical devices, and cosmetics. 52 Stat. 1040, 1042.

37.     The 1938 Act defined the terms "adulterated" and "misbranded." *See, e.g.*, 52 Stat. at 1049 (stating that a drug or device is "adulterated if it consists in whole or in part of any filthy, putrid, or decomposed substance"); *id.* at 1050 (stating that a drug or device is "misbranded if its labeling is false or misleading in any particular").

38.     On numerous occasions since 1938, Congress has amended the definitions of "adulterated" and "misbranded" to include situations in which a product fails to comply with an FDCA requirement even if the failure to meet that requirement does not render the product

defective or the product's labeling inadequate. *See*, *e.g.*, 21 U.S.C. § 351(a)(2)(B) & (h), 21 C.F.R. pts. 210, 211, 820; 21 U.S.C. § 352(ff).

39.     The 1938 Act provided three enforcement tools to address "adulterated" and "misbranded" products—a district court criminal prosecution of the person distributing the products, a district court injunction restraining the person from distributing the products, and a district court-ordered seizure and destruction of the products. *See* 52 Stat. at 1043-44. Those three enforcement tools still exist today. *See* 21 U.S.C. §§ 332, 333, 334.

40.     However, section 307 of the 1938 Act made clear that *only* the Federal Government could enforce the Act. *See* 52 Stat. 1046 ("All such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States.").

41.     In the eighty-six years since it enacted the FDCA, Congress has provided for only one exception to the Federal Government's exclusive authority to enforce the Act. In 1990, Congress amended the Act to allow a State, in limited circumstances, to bring a civil action to enforce some of the Act's provisions relating to food.[1]

**D.     Congress attempts to reduce smoking by amending the Federal Food, Drug, and Cosmetic Act to regulate cigarettes.**

42.     In 2009, Congress amended the FDCA through the Family Smoking Prevention and Tobacco Control Act ("TCA") to grant the FDA authority over certain traditional tobacco products, including cigarettes. Pub. L. No. 111-31, Div. A, 123 Stat. 1776; 21 U.S.C. § 387a(b).

---

[1]     Section 310 of the current FDCA, 21 U.S.C. § 337(a), states: "Except as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States." Subsection (b) allows a State, in limited circumstances, to bring a civil action to enforce some of the Act's food provisions.

43. Congress granted this authority to the FDA because cigarettes "cause cancer, heart disease, and other serious adverse health effects." TCA § 2(2), 123 Stat. 1776, 1777 (codified at 21 U.S.C. § 387 note).

44. Indeed, Congress found that the use of cigarettes "is the foremost preventable cause of premature death in America," that it "causes over 400,000 deaths in the United States each year," and that "approximately 8,600,000 Americans have chronic illnesses related to smoking." TCA § 2(13), 123 Stat. 1776, 1777. Congress also found that a 50 percent "reduction in youth smoking" would save "over 3,000,000" minors "from premature death due to tobacco-related disease" and "would result in approximately $75,000,000,000 in savings attributable to reduced health care costs." TCA § 2(13), 123 Stat. 1776, 1777.

45. However, the TCA prohibits the FDA from "banning all cigarettes." 21 U.S.C. § 387g(d)(3)(A). In fact, cigarette manufacturers can market "new" cigarettes—defined as cigarettes that were not commercially marketed in the United States as of February 15, 2007—if the manufacturer can demonstrate to the FDA that the new cigarette is "substantially equivalent to" one marketed in the United States before that date. 21 U.S.C. § 387j. The FDA has authorized the marketing of more than 3,100 new cigarettes through the issuance of "pre-existing tobacco product," "substantially equivalent," and "substantially equivalent exemption" orders.[2]

46. Many of those newly authorized cigarettes are manufactured by the "Big Tobacco" companies—e.g., companies operated by Altria Group Inc. and Reynolds American Inc. Altria's operating companies include Phillip Morris (the largest cigarette manufacturer in the United States and the maker of Marlboro, Benson & Hedges, and Virginia Slims cigarettes). Reynolds American

---

[2] *See* FDA Searchable Products Database, available at https://www.accessdata.fda.gov/scripts/searchtobacco/ (last accessed on March 23, 2025).

is a wholly owned subsidiary of British American Tobacco. Its operating companies include the R.J. Reynolds Tobacco Company (the second-largest cigarette manufacturer in the United States and the maker of Camel, Lucky Strike, and Newport cigarettes).

47.     According to the Federal Trade Commission's most recently released data, the major cigarette manufacturers sell approximately 170 billion cigarettes in the United States every year. *See* Federal Trade Commission Cigarette Report for 2022 at 3 (Oct. 30, 2023).[3]

**E.     The FDCA's tobacco product requirements are extended to electronic nicotine delivery systems.**

48.     The FDCA's tobacco product requirements originally extended only to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco." *See* 21 U.S.C. § 387a(b). The requirements were extended to ENDS products containing tobacco-derived nicotine in August 2016. *See* 81 Fed. Reg. 28974 (May 10, 2016). The requirements were extended to ENDS products "containing nicotine from any source" (including non-tobacco-derived nicotine) in April 2022. *See* Pub. L. No. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

49.     ENDS, also known as electronic cigarettes, heat a solution containing nicotine, flavorings, and other ingredients (called "e-liquid") into an aerosol that the user inhales. Unlike traditional cigarettes, ENDS do not contain any tobacco leaf, do not rely on combustion, and do not generate smoke.

50.     As the top officials from the National Institutes of Health ("NIH") and FDA recently noted, "[m]any adults who smoke have used e-cigarettes to quit smoking."[4] Moreover,

---

[3]     Available at https://www.ftc.gov/system/files/ftc_gov/pdf/2022-Cigarette-Report.pdf (last accessed Apr. 28, 2025).

[4]     H. Harraich, et al., *Opportunities for Innovation in Smoking Cessation Therapies: A Perspective from the National Institutes of Health and the U.S. Food and Drug Administration*, Annals of Internal Medicine, Oct. 15, 2024, at 3.

according to the FDA, "ENDS are generally likely to have fewer and lower concentrations of harmful and potentially harmful constituents" than cigarettes and "biomarker studies demonstrate significantly lower exposure to [those harmful constituents] among current exclusive ENDS users than current smokers."[5] Thus, "smokers who switch completely to ENDS will have reduced toxic exposures and this likely leads to less risk of tobacco-related diseases."[6]

51.     And, while the nicotine found in ENDS is not harmless, the FDA has emphasized that "the nicotine in cigarettes is *not* directly responsible for the cancer, lung disease, and heart disease that kill hundreds of thousands of Americans each year . . . . [Rather], it's the other chemical compounds in tobacco, and in the smoke created by setting tobacco on fire, that directly and primarily cause the illness and death."[7] As the FDA has explained, "If you could take every adult smoker . . . and fully switch them to e-cigarettes, that would have a substantial public health impact."[8]

**F.     The FDA exercises enforcement discretion regarding unauthorized ENDS.**

52.     When ENDS containing tobacco-derived nicotine became subject to the FDCA in August 2016, they became "adulterated" tobacco products until the manufacturer obtained an FDA

---

[5]     *FDA v. Wages and White Lion Investments, L.L.C.*, No. 23-1038, App. to Pet. Cert. 251a-252a (U.S. Mar. 19, 2024).

[6]     FDA, *Technical Project Lead (TPL) Review of PMTAs* at 6 (May 12, 2022), https://perma.cc/7BGZ-DUEH.

[7]     FDA Commissioner Scott Gottlieb, Protecting American Families: Comprehensive Approach to Nicotine and Tobacco (June 28, 2017), https://tinyurl.com/4zjcmvjb (emphasis added).

[8]     CSPAN, *FDA Commissioner on E-Cigarettes and Public Health Concerns*, at 10:25 (Sept. 25, 2018), https://tinyurl.com/mujce8hr.

13

marketing granted order through the premarket tobacco product application ("PMTA") process. 21 U.S.C. §§ 387b(6)(A), 387j(a)(2)(A).

53.     Similarly, when ENDS containing non-tobacco-derived nicotine became subject to the FDCA in April 2022, they became "adulterated" tobacco products until the manufacturer obtained an FDA marketing granted order through the PMTA process. 21 U.S.C. §§ 387b(6)(A), 387j(a)(2)(A).

54.     However, there were already countless ENDS with tobacco-derived nicotine on the market in August 2016; likewise, there were countless ENDS with non-tobacco-derived nicotine on the market in April 2022.

55.     The FDA has recognized that immediately forcing all unauthorized ENDS off the market while manufacturers go through the PMTA process could result in many ENDS users reverting to traditional cigarettes. *See Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 498-99 (6th Cir. 2020) (noting the FDA's view that removing all unauthorized ENDS from the market too quickly "creates a genuine risk of migration from potentially less harmful [e-cigarette] products back to combustible products," and that this would be a "public health outcome that should be avoided if at all possible").

56.     Therefore, "[t]hrough enforcement [discretion] policies that FDA *has revised over time*, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes." Exhibit B, Letter from FDA to the U.S. International Trade Commission, dated October 27, 2023, at 2) (emphasis added).

57.     Indeed, since ENDS became subject to the FDCA in 2016, the FDA has revised its enforcement discretion policy no less than seven times. Those revisions were as follows:

a. **May 2016**: When the FDA announced the finalization of its rule "deeming" ENDS products with tobacco-derived nicotine to be subject to the FDCA, the agency also announced that its policy would be to exercise enforcement discretion for those unauthorized products until August 2019 (so long as the product was on the market by August 2016 and the manufacturer submitted a PMTA by August 2018).[9]

b. **May 2017**: Approximately four months after President Trump first took office, and less than a week after President Trump's first FDA Commissioner was sworn in, the FDA extended its enforcement discretion period for unauthorized ENDS until November 2019 (so long as the product was on the market by August 8, 2016, and the manufacturer submitted a PMTA by November 9, 2018).[10]

c. **July 2017**: As part of the FDA's new "comprehensive regulatory plan to shift [the] trajectory of tobacco-related disease [and] death," the agency announced that the enforcement discretion period for unauthorized ENDS would be extended until August 2023 (so long as the product was on the market by August 8, 2016, and the manufacturer submitted a PMTA by August 9, 2022).[11]

d. **July 2019**: In response to a court ruling, the FDA shortened the enforcement discretion period for unauthorized ENDS to May 2021 (so long as the product was on the market by August 8, 2016, and the manufacturer submitted a PMTA by May 9, 2020).[12]

e. **January 2020**: Largely in response to the popularity among youth of JUUL brand ENDS—an unauthorized "cartridge-based" ENDS that looked like a

---

[9]     *See Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act: Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,974, 29,011 (May 10, 2016).

[10]    *See Three Month Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule; Guidance for Industry; Availability*, 82 Fed. Reg. 22338 (May 15, 2017); Exhibit C, FDA Guidance for Industry, Three-Month Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule at 8 (May 2017).

[11]    Exhibit D, FDA News Release, FDA announces comprehensive regulatory plan to shift trajectory of tobacco-related disease, death (July 27, 2017); Exhibit E, FDA Guidance for Industry, Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule (Revised) at 8 (Aug. 2017); *Extension of Certain Tobacco Product Compliance Deadlines Related to the Final Deeming Rule; Guidance for Industry; Availability*, 82 Fed. Reg. 37,459 (Aug. 10, 2017)).

[12]    *See Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479, 487 (D. Md. 2019).

15

USB drive and was easy for youth to conceal from their teachers at school and from their parents at home—the FDA revised its enforcement discretion policy to target unauthorized cartridge-based ENDS that came in flavors other than tobacco or menthol.[13]

 f. **April 2020**: As a result of the COVID-19 pandemic, the enforcement discretion period for other unauthorized ENDS was extended to September 2021 (so long as the product was on the market by August 8, 2016, and the manufacturer submitted a PMTA by September 9, 2020).[14]

 g. **September 2021**: Since September 2021, the FDA has exercised its enforcement discretion with respect to unauthorized ENDS on a "case-by-case" basis, citing its authority to do so under the Supreme Court's *Heckler v. Chaney* decision.[15] In exercising its enforcement discretion, the FDA says that it "is continuously evaluating new information and adjusting its enforcement priorities in light of the best available data," and that it "will take appropriate action regarding [ENDS] that are marketed without premarket authorization, including as warranted based on changed circumstances, new information, or to better address minors' use of those products."[16]

**G. Reynolds tries, but fails, to convince the FDA to revise its enforcement discretion policy.**

 58. In February 2023, RAI Services Company, an R.J. Reynolds affiliate, filed a Citizen Petition with the FDA requesting that the agency "adopt a new enforcement" policy because the FDA "was not [doing] enough" to prevent underage use of unauthorized ENDS. *See* Exhibit G, Reynolds's Citizen Petition at 3 (Feb. 6, 2023).

---

[13] Exhibit F, FDA Guidance For Industry, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Authorization (Revised) at 19 (April 2020)).  The April 2020 Guidance made slight revisions to the January 2020 Guidance, such as extending the PMTA deadline to September 9, 2020.  *See id.* at 31.  Other changes made in the April 2020 version are not relevant here.

[14] Exhibit F at 31-22.

[15] *Id.* at 9 n. 20 (citing *Heckler v. Chaney*, 470 U.S. 821, 835 (1985), for the proposition that the FDCA's "enforcement provisions commit broad discretion to the [FDA] to decide how and when they should be exercised").

[16] *Id.* at 3.

59.    However, Reynolds's proposed policy excluded the company's own unauthorized ENDS from enforcement even though the latest CDC data showed that those ENDS were the second most popular ENDS among high-school students and the third most popular ENDS among middle-school students.[17]

60.    Reynolds justified its proposal to exclude its own unauthorized ENDS from enforcement on the grounds that the products were on the market by August 8, 2016, the company submitted PMTAs for those products by September 9, 2020, and those PMTAs were still under review or were the subject of ongoing litigation against the FDA.

61.    But Reynolds's justification for excluding its unauthorized ENDS from enforcement was pretextual in that Reynolds's proposed policy would have offered no safe harbor for ENDS with non-tobacco-derived nicotine even if the product had a pending PMTA that had been timely filed when Congress made those products subject to the FDCA in April 2022. In other words, Reynolds's proposed enforcement policy was aimed at protecting the company's sales of its own cigarettes and unauthorized ENDS; it was not aimed at reducing youth usage of ENDS.

62.    The FDA denied Reynolds's Citizen Petition in November 2023. *See* Exhibit I, Letter from FDA to RAI Services Co. (Nov. 14, 2023).  In doing so, the FDA told Reynolds:

> [W]e do not agree that FDA has taken insufficient compliance and enforcement action against illegally marketed ENDS products . . . . To the contrary, we believe that FDA's comprehensive approach to this matter demonstrates the Agency's robust commitment to implementing and enforcing the law with respect to such products (including restricting such unauthorized products from the lawful marketplace) and preventing their access to and promotion of use by youth.

---

[17]    *See* Exhibit H, Monica Cooper, et al., *E-cigarette Use Among Middle and High School Students—United States*, *2022*, 71 Morbidity and Mortality Weekly Report 1283, 1284 (Oct. 7, 2022) (stating that among high school students who had used an ENDS in the past 30 days, 23.8% used a Vuse brand ENDS; stating that among middle school students who had used an ENDS in the past 30 days, 20.9% had used a Vuse brand ENDS)).

17

*Id.* at 3.

63.     The FDA also provided Reynolds with a three-page, single-spaced summary of the various regulatory and enforcement actions the agency had taken to prevent youth usage of ENDS. *See id.* at 5-7. The FDA concluded that "[g]iven all of [those] regulatory and enforcement actions," it was "clear that FDA has been taking critical compliance and enforcement efforts targeting [unauthorized] ENDS products." *Id.* at 8. The FDA also assured Reynolds that the agency "is continuously evaluating new information and, in making enforcement decisions, taking into account data on youth use and other risk factors." *Id.*

**H.     Reynolds tries, but fails, to convince the U.S. International Trade Commission to bar the importation of products identified in its Citizen Petition to the FDA.**

64.     While its Citizen Petition to the FDA was pending, Reynolds also filed a complaint at the United States International Trade Commission ("ITC") asking the Commission to, *inter alia*, bar the importation of the same products that Reynolds asked the FDA to target via its Citizen Petition. *See Re: Complaint Filed by R.J. Reynolds Tobacco Co. and R.J. Reynolds Vapor Co. Concerning Certain Disposable Vaporizer Devices & Components & Packaging Thereof*, Inv. No. 337-TA-1381, 2023 WL 11932250, *1 (U.S. Int'l Trade Comm'n Dec. 15, 2023).

65.     After learning about Reynolds's ITC complaint, the FDA filed a letter with the ITC urging it to reject Reynolds's attempt to use the Commission to enforce the FDCA. *See* Exhibit B. Citing 21 U.S.C. § 337(a), the FDA noted that Congress wants "decisions about the regulatory or compliance status of tobacco products and what products should be prioritized for enforcement [to] reflect the view of the agency charged with administering the FDCA." *Id.* at 3. The FDA also noted that 21 U.S.C. § 337(a) reflects congressional intent to have "uniform administration of the FDCA." *Id.*

18

66. Based in part on the FDA's letter, the ITC dismissed Reynolds's claim seeking to bar the importation of unauthorized ENDS. *See* Inv. No. 337-TA-1381, 2023 WL 11932250, *1 (stating that "the Commission agrees with FDA"). The ITC reasoned that "it would usurp the FDA's authority to enforce the FDCA and impermissibly grant a private right of action to enforce the FDCA if the Commission were to institute an investigation based on the Reynolds complaint." *Id.* at *2.

## I. The North Carolina General Assembly adopts Reynolds's proposed enforcement policy for unauthorized ENDS.

67. The North Carolina General Assembly passed S.L. 2024-31 in June 2024, and the Governor signed S.L. 2024-31 into law in July 2024. *See* Exhibit A.

68. S.L. 2024-31 directs the Department of Revenue to do, in effect, what Reynolds asked the FDA to do via its March 2023 Citizen Petition and what Reynolds asked the International Trade Commission to do via its October 2023 complaint to the Commission—that is, to take enforcement action against persons selling ENDS that have not been authorized by the FDA unless the product was on the market by August 8, 2016, and the product has a pending PMTA that was filed by September 9, 2020.

69. S.L. 2024-31 establishes the following procedures by which the Department of Revenue will step into the FDA's role with respect to the enforcement of the FDCA's tobacco provisions:

      a. An ENDS manufacturer whose products are sold in North Carolina must, on an annual basis, certify to the Department of Revenue that (1) those products have been authorized for sale by the FDA pursuant to the FDCA, 21 U.S.C. § 387j(c); or (2) the product was on the market by August 8, 2016, the manufacturer submitted a premarket tobacco application for the product to the FDA by September 9, 2020, and the application remains under review by the FDA or the denial of the application is under judicial review. S.L. 2024-31, Section 2(b) (codified at N.C. Gen. Stat. § 143B-245.11(a)).

19

b. Beginning on May 1, 2025, the Department of Revenue shall publish (and update at least monthly) a Directory listing all manufacturers that have provided certifications that comply with the statute and all product names, brand names, categories, and flavors for which certifications have been submitted and approved by the Secretary. S.L. 2024-31, Section 2(b) (codified at N.C. Gen. Stat. § 143B-245.12(a)).

c. Each retailer shall have 60 days from the date the Secretary first makes the Directory publicly available to sell products in its inventory that are not included in the Directory or remove those products from its inventory and return them to the distributor or wholesaler from whom the products were purchased for a refund. S.L. 2024-31, Section 2(b) (codified at N.C. Gen. Stat. § 143B-245.13(a)).

d. Each distributor or wholesaler shall have 60 days from the date the Secretary first makes the Directory publicly available to remove those products intended for ultimate retail sale in North Carolina from its inventory. *Id.*

e. After 60 calendar days following publication of the Directory, ENDS products not listed in the Directory and intended for retail sale in North Carolina may not be purchased or sold for retail sale in North Carolina. *Id.*

f. Retailers, distributors, and wholesalers who sell ENDS products that are not on the Directory will be subject to fines up to $750 and revocation of tobacco product licenses. S.L. 2024-31, Section 2(a) (codified at N.C. Gen. Stat. § 14-313(h)(1)(a)). Manufacturers who sell ENDS products that are not on the Directory are subject to civil penalties of $10,000 per product. *Id.* (codified at N.C. Gen. Stat. § 14-313(h)(2)).

70. The Department of Revenue has indicated that it will publish the Directory on May 1, 2025, and that the 60-day grace period under the statute will end on June 29, 2025. *See* Exhibit J, Department of Revenue Q&A Document.

**J. The FDA announces that youth vaping has dropped to its lowest level in ten years.**

71. On September 5, 2024, the FDA announced that the latest CDC data shows that 500,000 "fewer U.S. youth reported current use of [ENDS] in 2024 compared to 2023." Exhibit K, FDA Press Release dated Sept. 5, 2024, "Youth E-Cigarette Use Drops to Lowest Level in a Decade"). This represented a drop to approximately one-third of the number of youth who reported using ENDS during the "peak" of youth usage in 2019. *Id.* Importantly, this dramatic decline in

20

youth vaping occurred even with the wide variety of ENDS products on the market, which Reynolds has previously tried, but failed, to convince the FDA and the ITC to ban, but which S.L. 2024-31 would ban.

## COUNT I

### Declaratory and Injunctive Relief on the Ground that S.L. 2024-31 Violates the Supremacy Clause of the United States Constitution

72. Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs adopt by reference all preceding paragraphs as if fully set forth herein.

73. Under the Supremacy Clause of the United States Constitution, federal law impliedly preempts state law when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

74. Congress intended that the Federal Government have the sole authority to enforce the Federal Food, Drug, and Cosmetic Act's provisions on tobacco products. *See* 21 U.S.C. § 337(a) ("all such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States").

75. In other words, the FDCA's enforcement provisions "commit complete discretion to [the FDA] to decide how and when they should be exercised." *Heckler v. Chaney*, 470 U.S. 821, 835 (1985).

76. Title 21 U.S.C. § 337(a) impliedly preempts state law when "the existence of [the FDCA]" is a "critical element" of the state law. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 353 (2001). The measures subject to implied preemption include state statutes. *Evans v. Rich*, No. 5:13-CV-868-BO, 2014 WL 2535221, at *2 (E.D.N.C. June 4, 2014).

77. 21 U.S.C. § 337(a) impliedly preempts S.L. 2024-31.

21

a. S.L. 2024-31 stands as an obstacle to Congress's intention that the federal government have the exclusive authority to enforce the FDCA in that S.L. 2024-31 authorizes the North Carolina Department of Revenue to enforce the FDCA's requirements regarding ENDS products.

b. The existence of the FDCA is a critical element of S.L. 2024-31.

78. S.L. 2024-31 injures one or more of Plaintiff VTA's members in that it forces them to stop selling certain unauthorized ENDS (including, but not limited to, unauthorized ENDS that contain non-tobacco-derived nicotine) in North Carolina even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those particular products.

79. S.L. 2024-31 injures Plaintiff AMV by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine in North Carolina even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products. While AMV sells other products as well in its stores, including federally legal hemp products, sales of those products will not be sufficient to allow AMV to keep its North Carolina stores open in the event that Defendants are not enjoined from enforcing S.L. 2024-31 by June 29, 2025. AMV will thus suffer injury not only from lost profits from sales it is no longer able to make of unauthorized ENDS, but also from lost profits from sales of its other merchandise, including federally legal hemp products.

80. S.L. 2024-31 injures Plaintiff Bright Leaf by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products. While Bright Leaf sells other products as well in its stores, sales of those products will not be sufficient to allow Bright Leaf to keep its stores open in the event that Defendants are not enjoined from enforcing S.L. 2024-31 by June 29, 2025. Bright Leaf will thus suffer injury not

22

only from lost profits from sales it is no longer able to make of unauthorized ENDS, but also from lost profits from sales of its other merchandise.

81. S.L. 2024-31 injures Plaintiff Triton by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine to North Carolina customers even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products.

82. S.L. 2024-31 forces retailers to stop selling certain unauthorized ENDS products (including, but not limited to, unauthorized ENDS products containing non-tobacco-derived nicotine) and, in so doing, injures Plaintiff Murphy by denying her the ability to purchase and use the ENDS products containing non-tobacco-derived nicotine she prefers, even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products.

## COUNT II

**Declaratory and Injunctive Relief on the Ground that S.L. 2024-31 Violates the
Equal Protection Clause of the Fourteenth Amendment to the United States Constitution**

83. Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiffs adopt by reference paragraph 1 through 82, above, as if fully set forth herein.

84. The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

85. A State violates the Equal Protection Clause when it treats similarly situated persons differently and there is no rational basis for the differential treatment. *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). A State's action fails this rational-basis test when there is no "plausible

23

policy reason for" the differential treatment or the differential treatment is "arbitrary" or "irrational." *Id.*

86. S.L. 2024-31 treats manufacturers and sellers of unauthorized ENDS containing tobacco-derived nicotine differently from manufacturers and sellers of unauthorized ENDS containing non-tobacco-derived nicotine. Specifically, S.L. 2024-31 allows the sale of some unauthorized ENDS containing tobacco-derived nicotine that were on the market as of August 2016 and for which a still pending PMTA was filed by September 2020. But S.L. 2024-31 does not allow the sale of any unauthorized ENDS containing non-tobacco-derived nicotine, including those for which a still-pending PMTA was timely filed.

87. S.L. 2024-31 treats consumers of unauthorized ENDS containing tobacco-derived nicotine differently from consumers of unauthorized ENDS containing non-tobacco-derived nicotine. Specifically, S.L. 2024-31 has the effect of allowing consumers of some unauthorized ENDS containing tobacco-derived nicotine that were on the market as of August 2016 and for which a still pending PMTA was filed by September 2020 to continue purchasing and consuming their preferred products. But S.L. 2024-31 does not allow consumers of any unauthorized ENDS containing non-tobacco-derived nicotine, including those for which a still pending PMTA was timely filed, to continue purchasing and consuming their preferred products.

88. S.L. 2024-31's differential treatment of manufacturers, sellers, and consumers of unauthorized ENDS with non-tobacco-derived nicotine fails the rational basis test. There is no plausible policy reason for treating the manufacturers, sellers, and consumers of ENDS containing non-tobacco-derived nicotine differently from manufacturers, sellers, and consumers of ENDS containing tobacco-derived nicotine. The differential treatment of the two products is arbitrary and irrational.

89. The Federal Food, Drug, and Cosmetic Act makes no distinction between tobacco products containing tobacco-derived nicotine and tobacco products containing non-tobacco-derived nicotine. *See* 21 U.S.C. § 321(rr)(1) (defining "tobacco product" as "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption").

90. The arbitrariness and irrationality of S.L. 2024-31's differential treatment of ENDS containing tobacco-derived nicotine from ENDS containing non-tobacco-derived nicotine is underscored by the fact that tobacco-derived nicotine is likely to contain a higher level of organic impurities than manufactured, non-tobacco-derived nicotine, yet, paradoxically, ENDS products containing tobacco-derived nicotine are treated preferentially under S.L. 2024-31.

91. North Carolina's violation of the Equal Protection Clause injures one or more of Plaintiff VTA's members in that it forces them to stop selling unauthorized ENDS that contain non-tobacco-derived nicotine in North Carolina even though the FDA may decide to not exercise its discretion to enforce the FDCA premarket authorization requirements for those products.

92. North Carolina's violation of the Equal Protection Clause injures Plaintiff AMV by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine in North Carolina even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products. While AMV sells other products as well in its stores, including federally legal hemp products, sales of those products will not be sufficient to allow AMV to keep its North Carolina stores open in the event that Defendants are not enjoined from enforcing S.L. 2024-31 by June 29, 2025. AMV will thus suffer injury not only from lost profits from sales it is no longer able to make of unauthorized ENDS containing non-

25

tobacco-derived nicotine, but also from lost profits from sales of its other merchandise, including federally legal hemp products.

93.     North Carolina's violation of the Equal Protection Clause injures Plaintiff Bright Leaf by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products. While Bright Leaf sells other products as well in its stores, sales of those products will not be sufficient to allow Bright Leaf to keep its stores open in the event that Defendants are not enjoined from enforcing S.L. 2024-31 by June 29, 2025. Bright Leaf will thus suffer injury not only from lost profits from sales it is no longer able to make of unauthorized ENDS containing non-tobacco-derived nicotine, but also from lost profits from sales of its other merchandise.

94.     North Carolina's violation of the Equal Protection Clause injures Plaintiff Triton by forcing it to stop selling its unauthorized ENDS products containing non-tobacco-derived nicotine to North Carolina customers even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products.

95.     North Carolina's violation of the Equal Protection Clause injures Plaintiff Murphy by denying her the ability to purchase and use the ENDS products containing non-tobacco-derived nicotine she prefers, even though the FDA may decide not to exercise its discretion to enforce the FDCA premarket authorization requirements for those products.

## **REQUEST FOR RELIEF**

96.     Plaintiffs respectfully request that this Court enter a judgment in their favor that includes the following relief:

a.        A declaration pursuant to 28 U.S.C. § 2201 that S.L. 2024-31 violates the Supremacy Clause of the United States Constitution;

b.        A declaration pursuant to 28 U.S.C. § 2201 that S.L. 2024-31 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

c.        Preliminary and permanent orders enjoining the Secretary of Revenue from implementing and enforcing S.L. 2024-31;

d.        An order awarding Plaintiffs their costs, expenses, and fees (including attorneys' fees); and

e.        An order granting such further relief as is necessary and appropriate.

This 30th day of April, 2025.

/s/ Matthew W. Sawchak
Matthew W. Sawchak
N.C. State Bar No. 17059
msawchak@robinsonbradshaw.com

Robert W. Fuller
N.C. State Bar No. 10887
rfuller@robinsonbradshaw.com

Caitlan M. Carberry
N.C. State Bar No. 58480
ccarberry@robinsonbradshaw.com

Samuel P. Gerstemeier
N.C. State Bar No. 60885
sgerstemeier@robinsonbradshaw.com

Robinson, Bradshaw & Hinson, P.A.
434 Fayetteville Street, Suite 1600
Raleigh, NC 27601
Telephone: (919) 239-2600
Facsimile: (919) 328-8790

Eric N. Heyer*
James Fraser*

27

Joseph A. Smith*
Anna Stressenger*
THOMPSON HINE LLP
1919 M Street, NW, Suite 700
Washington, DC 20036
Telephone: (202) 331-8800
Facsimile: (202) 331-8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Joe.Smith@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com

*Counsel for Plaintiffs*

*Special appearance forthcoming